United States District Court
Eastern District of Michigan
Southern Division

John Lauve and
Robert Davis
    Plaintiffs,

Case No. ~~12726~~ ~~MKM~~
17-cv-12726
Honorable Mark Goldsmith

v.
Janice Winfrey, in her official capacity as
    Detroit City Clerk,
Daniel Baxter, in his official capacity as
    Director of Elections for
    City of Detroit Election Commission
    and
Detroit City Council,
    Defendents.

FILED
2017 AUG 31 A 9:48
U.S. DIST COURT CLERK
EAST DIST MICHIGAN
DETROIT

1

United States District Court
Eastern District of Michigan
Southern Division

Case no. 17-cv-~~[illegible]~~.
12726

Motion to Intervene

2

Case no 17-cv-HON
12726

United States District Court
Eastern District of Michigan
Southern Division

case no 17-cv-HON

Motion                          24(b)(1)B

Pursuant to Federal Rule 24(b)(1)B

I, Lucinda J. Darrah, seek to intervene to canvass
in order to have the court order that the City immediately all the
to Repeal Ordinance 19-17        per the rules Article 2012 Charter
petitions submitted in a timely manner
according to the City of Detroit 2012
Charter Rules in Article 12; Va volunteer, petitioner,
                 Joan Warwick's
personally submitted her petition with
to the Dept of Elections
signatures on the same day, but after
                    had been
the main group was submitted. The Department
          of petitions
of Elections accepted her petitions, but she
received a letter the following day that rejected
them. the signatures she gathered in support
        a
of the referendum on City of Detroit Ordinance 19-17.

(3)

Case No. 17cv-12726
-CV-12726

As a registered voter of the State of Michigan As a citizen of Detroit, Michigan and a petition signer and circulator and promoter, I want and pray that you extend your decision to include all signatures turned into the clerk within the time rules should be immediately canvassed and the issue can be promoted for political discussion this election cycle.

As a candidate who is asking Detroit Voters to write my name in for Detroit City Clerk and for City of Detroit Mayor, I want to promote a discussion on the need to address gentrification visa vie Downtown Development Authorities and Gilbert/Maroon

Encouraging citizens Participation is Crucial to our common survival. Petitioning Promotes Participation

Hooverville

④

Response to Some City Arguments: [City of Detroit]

Case no. 17-cv-12726

Canvass the petitions, then after that a discussion in public can be had on its viability for forthcoming steps.

Who is to say that the Council would not put it on the ballot if the [that or whatever] canvassed ballots are proven sufficient, after public involvement and discussion?

The plain language of the 2012 Detroit City Charter should be followed, not the city's bold assertions that have no factual or legal backing.

Does the court think a special [an expensive] election possibility is better than including it in the current political-back-of-debate election?

The DDA Catalyst Plan of 2014 was passed under the emergency manager. The 2017 amendment city ordinance 19-17 was passed by the incumbents who are up for re election now.

⑤

CASE NO CV-12726

The legislative intent of Article 12 language was to encourage citizen participation, not discourage it. Rosemary Robinson, Michigan House Representative for District 6, was a member of the 2012 Charter Commission, an elected position. She says that the commission meant for a liberal construction of article 12. She says the city has video tapes of the charter hearings. Why didn't the city attorneys look at the legislative intent if they wanted to reject the plain meaning of the language. I encourage the court to note Whitfiger of Dot Legislative Policy Analysis urging city to reevaluate the need for the Michigan DDA act to be reevaluated.

⑥

petition turned in on the same day after Case no EV-12726
John Loave and Robert Davis turned in
the bulk of the 7,900 signatures, by Joan Warwick
receipt & rejection letter

Copy of petition I turned in, after the 30 days + 15 days but
before, the city clerk did her duty and obeyed the 2012 City Charter rules on
Referendum. I have misplaced the letter from the City of Detroit rejecting my pet. I.
the City will have a copy

## Notorized Affidavits of

Notarized Affidavit Declaring Writ-in Candidacy
for Detroit City Clerk and City of Detroit Mayor

This is an election Year and this action, or
really Inaction, retricts public discourse
suppress the Vote and the peoples' Participation
in their destiny development. The inability to
petition your government violates
our liberty and freedom and leaves us with
a police state.

I used to try to encourage people to note by telling
them, "vote or get a gun." Petitioning our government
is part of Voting, and the plain language of
our constitutions protects these rights.

(7)

United States District Court
Eastern District of Michigan
     Southern Division        Case no 17cv HON

Proof of Service

I personally served James Noseda
and Charlies Raimi on this at ~~500~~ Woodward
Suite 500, Det 48226 on Wednesday
8/30/17.

Lucinda J Cindy Darrah
8/30/17

I served James Noseda
in his office, on 8/30/17, the papers
I am filing today 8/31/17.
                    Lucinda J Darrah
                       8/31/17

Exibits

David Whitaker, Esq.
Director
Irvin Corley, Jr.
Executive Policy Manager
Marcell R. Todd, Jr.
Senior City Planner

LaKisha Barclift, Esq.
M. Rory Bolger, PhD, AICP
Timothy Boscarino, AICP
Kemba Braynon
Elizabeth Cabot, Esq.
Janese Chapman
Tasha Cowan

# City of Detroit

## CITY COUNCIL

### LEGISLATIVE POLICY DIVISION

208 Coleman A. Young Municipal Center
Detroit, Michigan 48226
Phone: (313) 224-4946   Fax: (313) 224-4336

Richard Drumb
George Etheridge
Deborah Goldstein
Derrick Headd
Marcel Hurt, Esq.
Kimani Jeffrey
Anne Marie Langan
Analine Powers, PhD
Sabrina Shockley
Thomas Stephens, Esq.
David Teeter
Theresa Thomas
Kathryn Lynch Underwood

TO:       DETROIT CITY COUNCIL

FROM:     David Whitaker, Director
          Legislative Policy Division Staff

DATE:     May 16, 2017

RE:       Review of the Proposed 2017 Downtown Development Authority (DDA)
          Amendments to the Restated Tax Increment Financing Plan and Development Plan
          for Development Area No. 1 (2017Amended DDA Plan)

## Introduction

The Legislative Policy Division (LPD) has been requested to provide a report with regard to the proposed 2017 DDA Amendments to the Restated Tax Increment Financing Plan and Development Plan for Development Area No. 1 (2017Amended DDA Plan). This Honorable Body approved a Memorandum of Understanding between the City of Detroit (City) and the Palace Sports & Entertainment, LLC (PS&E) with regard to the PS&E and the Detroit Pistons Basketball Team (Pistons) relocating to Detroit.[1]

LPD notes that the PS&E/City MOU is relative to the Pistons Corporate Headquarters and Practice Facility (Headquarters/Practice Facility) that was proposed to be part of the Catalyst Development Project unless the site for the facility was selected outside of the Catalyst Development Project area. However, regardless of what site was selected, the PS&E/City MOU required as part of the overall understanding that a community benefits agreement would be entered into between the PS&E the City. In addition, representations were made to this Honorable Body that the agreement

---

[1] The MOU between the City and PS&E included what the intended commitments are of PS&E to the City in relation to the implementation of the Development Project in return for the necessary approvals and support by the City in order to bring the project to fruition. PS&E commits to 1) relocating the Pistons basketball home games (to be played at the Events Center (a/k/a "Little Caesars Arena"), its operations and headquarters to the City, 2) pay all costs of the Pistons Development Project that are not funded by proceeds of the DDA Bonds 3) pay the maintenance costs and cost of capital improvements of the Pistons Development Project and 4) enter into a binding agreement setting forth the community benefits to be received by the City. The Pistons Development Project includes the modifications that are being made to the Events Center as well as the construction of the Practice Facility.

1

containing the community benefits with regard to the Headquarters/Practice Facility would be presented for approval at or before the Amended DDA Plan was approved. City Council should seek to ensure those representations are fulfilled.[2]

This is important because, the terms and conditions of the 2017 Amended DDA Plan are separate and apart from the Pistons Headquarters/Practice Facility project. However, as part of the PS&E/City MOU, Section II, *Agreements and Responsibilities of City,* the Amended DDA Plan was to be approved. As set forth in the PS&E/City MOU, the 2017 Amended DDA Plan would (i) modify the description of the DDA Plan to incorporate the Pistons Development Project (ii) authorize the issuance of additional bonded indebtedness by the DDA in order to support the Pistons Development Project, (iii) extend the term of the DDA Plan beyond its current expiration date of June 30, 2045 to support the issuance of the DDA Bonds and payment of other contractual obligations payable with Catalyst Project Revenues and (iv) increase the amount of Catalyst Project revenues available to reimburse Olympia Entertainment Events Center, LLC (OEEC) for eligible cost incurred in connection with the private projects completed in the area around the Events Center from $62 million to $74 million.

With regard to the analysis of the proposed 2017 Amended DDA Plan, LPD notes the DDA was established pursuant to Public Act 197 of 1975, Downtown Development Authority Act, MCL 125.1651 et seq.[3] The DDA under the original DDA Plan the Development Plan Area No. 1 was established based on findings that the properties located in the development area was experiencing low property values, experiencing blight and value deterioration, and was prime for rehabilitation and redevelopment.[4] Since the establishment of Development plan Area No.1 many changes have taken place by and through the assisted efforts of the DDA which has changed the landscape of Downtown Detroit. That being the case, LPD believes that at some point the DDA should conduct a review of its initial findings to determine whether they remain the same or whether conditions have changed, which should also be reflected in an amended DDA Plan.

The proposed changes identified in the 2017 Amended DDA Plan are primarily with regard to the Catalyst Development Project which is one of several projects within the DDA Plan for Development Area No.1. There are other amendments to the DDA Plan with regard to the other projects in Development Area No.1 as well as minor housekeeping changes, all of which are discussed to some extent in this report.

---

[2] LPD staff acted as Council's liaison during the community benefits process, as contemplated by the Community Benefits Ordinance that was passed by the voters of the City of Detroit on November 8, 2016. Our staff report of this process is forthcoming under separate cover.

[3] MLC 125.1653(1) provides: "When the governing body of a municipality determines that it is necessary for the best interests of the public to halt property value deterioration and increase property tax valuation where possible in its business district, to eliminate the causes of that deterioration, and to promote economic growth, the governing body may, by resolution, declare its intention to create and provide for the operation of an authority".

[4] The DDA determined the properties located in the Development Area No. 1 necessary for the following reasons: (1) tax generators are located on the property which will provide tax increment funds to be used in the financing of the Authority's development projects, (2) the assessed value of the property is so low that it is prime for rehabilitation or redevelopment; (3) the inclusion of the property will permit implementation of a specific development project or activity, including property that will permit flexibility in the final project design layouts; and (4) to correct evidence of blight and value deterioration, and to promote economic growth and development.

**Proposed 2017 Amended DDA Plan Amendments**

The proposed 2017 Amended DDA Plan amendments to the restated tax increment financing plan and development plan for Development Area No. 1 document is before this Honorably Body for consideration[5]. The proposed amendments to the Restated Tax Increment Financing Plan and Development Plan for Development Area No. 1 provide for, but are not limited to, certain modifications to the following: Catalyst Development Project, Ally Financial, Housing/Office/Retail Development and Absorption Fund, Land Assemblage, Tigers/Lions Stadia Complex, DDA Operating Fund, and Duration of the Plan. In addition, the amendments will provide for modifications to the Revenue Sources, and such revisions as to reflect the current status of the development projects of the Plan.

This proposal extends the duration of the plan from 2044-2045 to 2050-2051, for a total period of 34 years from 2017 to accommodate the pledge of Catalyst Project Revenues and other tax increment revenues to the repayment of the EC Tax Increment Revenue Bonds[6] and other Catalyst Development obligations.

The proposed boundaries of the 2017 Amended DDA Plan remain the same as those in the 2013 Amended DDA Plan. Council will recall that the 2013 Amended DDA Plan expanded the boundaries extending the DDA Development Area No. 1 boundaries just south of the Fisher Freeway as well as north and northwest of the Fisher Freeway. The 2013 plan's expanded boundaries also encompassed the "2013 Expansion Area", which comprised the Events Center and Ancillary Development Area located within the northern and northwestern part of the Catalyst Development Project Area. This allowed the DDA to capture additional tax incremental revenues in the expanded area to provide additional resources for DDA projects, including the Catalyst Development Project.

The DDA Board of Directors adopted the 2017 Amended DDA Plan on Wednesday, April 19, 2017, concluding that the 2017 Amended DDA Plan is necessary to aid in economic growth of the Detroit Development Area No. 1 and the Detroit Downtown District, to halt property value deterioration, to eliminate the causes of such deterioration, to promote economic growth and the increase of property tax valuation in the downtown business district, and to permit and assure achievement of the purposes of the DDA Act of 1975[7].

As City Council knows, a discussion and public hearing is set before the Planning and Economic Development Standing Committee, which will be expanded to include the entire City Council, on Thursday, May 25, 2017 regarding the 2017 Amended DDA Plan amendments.

---

[5] The DDA presented the last TIF plan amendments back in 2013, which approved by City Council on December 20, 2013 and the Emergency Manager on January 17, 2014. TIF plan amendments typically are presented to City Council whenever there is a major project or number of major project changes coming to fruition.

[6] "EC Tax Increment Revenue Bonds" are described under the section of the report entitled "(b) Changes Regarding the Ancillary Development Project", eight paragraph.

[7] When adopting the 2017 Amended DDA Plan, the DDA Board of Directors also determined that the developments described in the proposed amendments to the (2017) Plan will provide jobs for the jobless, help stabilize and increase property values in the DDA Downtown District, and encourage and increase business activity and investment in the Downtown District and surrounding areas.

3

In addition, on Monday, April 10, 2017, the Development Area Citizens Council (DACC) conducted a meeting on the 2017 Amended DDA Plan.  As a result of this meeting, members of the DACC requested an additional meeting following the public hearing at City Council on the DDA TIF Plan and Development Plan for Development Area No. 1 Amendment, to be informed of additional projects and timelines should they occur and a written outline of the DACC's role and responsibilities.  The DACC has 20 days following the public hearing to provide comment on the proposed Amendment to the Development and TIF Plan.

### Project Expenditure Changes in the 2017 Amended DDA Plan

Table 1 below reflects the project expenditure changes from the 2013 Amended DDA Plan to the 2017 plan. Since changes to the Events Center and the EC Ancillary Development Projects are the principal reasons for 2017 plan amendments, the discussion in this section of the report will focus primarily on these two projects.

| | 2013 TIF | 2017 TIF | | |
|---|---|---|---|---|
| **Table 1** 2017 Amended DDA Plan Project Expenditure Changes through 2051 (In Millions of Dollars) | | | | |
| Project Expenditure Description | Plan | Plan | Change | % Change |
| Convention Facilities Area Public Improvements | $4.58 | $5.56 | $0.98 | 0.2% |
| Tiger Stadium | $62.11 | $63.56 | $1.45 | 0.3% |
| Housing/Office/Retail Dev/Absorption Program | $146.25 | $265.68 | $119.43 | 26.0% |
| Land Assemblage | $167.74 | $286.75 | $119.01 | 25.9% |
| Ally Financial | $0.00 | **$11.63** | $11.63 | 2.5% |
| **EC Ancillary Development Project** | **$62.00** | **$74.00** | **$12.00** | **2.6%** |
| EC Repair Fund | $12.25 | $14.59 | $2.34 | 0.5% |
| **Closing Costs 2014/2014/2019** | **$8.36** | **$18.46** | **$10.10** | **2.2%** |
| Catalyst Bonds DS Reserve | $5.16 | $0.00 | ($5.16) | -1.1% |
| **Event Center Construction** | **$271.23** | **$305.73** | **$34.50** | **7.5%** |
| DDA Operating Fund | $34.95 | $39.45 | $4.50 | 1.0% |
| Closing Costs/Trustee Fees | $6.72 | $7.46 | $0.74 | 0.2% |
| Bond Debt Service Reserve | $0.00 | $0.30 | $0.30 | 0.1% |
| Michigan Avenue Garage Debt Service | $16.78 | $15.42 | ($1.36) | -0.3% |
| Rolling Defeasance/96/98 Debt Service | $498.15 | $495.94 | ($2.21) | -0.5% |
| **2014/2017/2019 Debt Service** | **$561.48** | **$713.04** | **$151.56** | **33.0%** |
| | | | $ 459.81 | 100.0% |
| EC Repair Fund  not included in 2013 Table, but part of approved plan | | | $   12.25 | |
| Total 2017 Amended DDA Plan Project Expenditures Changes | | | $ 472.06 | |

I.      **Amendments to the Catalyst Development Project**

LPD will first address the proposed 2017 Amended DDA Plan as it relates to the Catalyst Development Project which includes the Multipurpose Events Center (Events Center)[8].

**(a) Changes Regarding the Events Center Project**

Under Section 407.11.1, *Events Center Project,* changes have been made under specific headings of the DDA plan:

> **Project Description**:

The changes under this heading reflect that on November 2016, the Detroit Pistons announced plans to relocate to the Events Center which would be modified to accommodate its use as the Pistons' home arena beginning fall 2017. Deleted is language that once referred to a potential Detroit/Wayne County Stadium Authority[9] having ownership of the arena facility. The new language identifies the DDA as the owner of the Events Center and that a concession management agreement (the "ECCMA") between the DDA and Olympia Entertainment Events Center, LLC ("OEEC") has been entered and pursuant to the terms of the ECCMA the OEEC is responsible for the management and operation of Events Center. In addition, the 2017 Amended DDA Plan reflects that the City, the Economic Development Corporation (EDC) and OEEC have conveyed ownership of their properties in the project area to the DDA.

> **Developer:**

Under the heading of Developer, the 2017 Amended DDA Plan reflects that the DDA will own the Events Center. The language referencing a Detroit Wayne County Stadium Authority having ownership of the Events Center has been deleted.

> **Location, Extent and Character of Proposed Improvements**

The 2017 Amended DDA Plan shows a reduction of the boundaries of the location of the Events Center as being west of Woodward Ave, east of Cass Avenue, commencing at vacated Henry Street and continuing north to the vacated Sproat Street. The Events Center project area has been reduced from 23.2 acres to 12.87 acres. The 2017 Amended DDA Plan provides that the Events Center will feature in addition to an NHL regulation ice ring a practice rink, and a NBA regulation basketball court. The language further reflects the Events Center is planned as an NHL and NBA caliber arena with approximately 20,000 (seating capacity has been increased by 2,000) as well as the attached parking deck having an increase of parking capacity by 600 spaces to accommodate 1,100 vehicles. The 2017 Amended DDA Plan includes language that provides that the

---

[8] The Events Center includes the arena, a parking garage and adjacent buildings and improvements with restaurant, retail and concessionaire office space.

[9] The Detroit/Wayne County Stadium Authority (DWCSA) was incorporated on August 22, 1996 under the provisions of Act 31, Public Acts of Michigan of 1948. Its purpose is to construct, maintain, operate, and own the stadia and their related structures and is authorized to enter into contracts and indebtedness. The DWCSA is the current owner of Ford Field and Comerica Park.

modifications to the Events Center will cost at least $34.5 million to meet the requirements of the NBA and Pistons.

### Events Center Estimated Cost

The 2017 Amended DDA Plan modifies the estimated cost for the Events Center. The total estimated cost of the Events Center has been revised from $450 million to $862 million. The private contribution to the Events Center has been revised from $188,412,775 to now reflect $538,800,000. The public contribution towards the Events Center has been revised from $261,587,225 to now reflect $324,100,000[10]. The language identifying where the cost for construction of the Events Center has changed by removing the language indicating the funding source as the Michigan Strategic Fund (MSF) and reflects the funds are being held and dispersed by the bond trustee in accordance with the Events Center Concession Management Agreement (EC CMA) being the (i) proceeds of the 2014A Bonds; (ii) proceeds of the 2014B Bonds; (iii) proceeds of the Series 2017 DDA Bonds, if any; and (iv) funds in the amount of $34,750,000 (the Existing Catalyst Revenues)[11]. The new language also establishes that "any costs of the Events Center in excess of the above-referenced sources will be paid by OEEC or its affiliate pursuant to the terms of the EC CMA."

The DDA Plan also has been amended to reflect that the Events Center Tax Increment Revenue Bonds will be secured by a pledge of the DDA of the tax increment revenues (as provided under the Downtown Development Authority Act, MCL 125.1651(cc) (vi))[12] the "Catalyst Project Revenues" and its local tax increment revenues and will be repaid by the following sources:

1. An irrevocable pledge by the Authority of the Catalyst Project Revenues[13] as authorized by MCL 125.1664(6)[14].

---

[10] Amount includes $250,000,000 par value of Series 2014A DDA Bond; $34,750,000 in Existing Catalyst Revenues; proceeds of $34,500,000 from Series 2017 DDA Bonds (to pay for the Pistons/NBA modifications); and $4,850,000 in estimated net closing costs and debt services reserves for Series 2017 DDA Bonds and refunding of Series 2014A DDA Bond and Series 2017 DDA Bonds anticipated prior to January 1, 2019.

[11] The funds are comprised of Catalyst Project Revenues held by the DDA prior to the date of the issuance of the 2014A Bonds and attributable to periods from and after July 1, 2010, deemed to be attributable to such periods, or otherwise authorized by the Michigan Department of Treasury.

[12] MCL 125.1651(cc)(vi) provides in pertinent part that tax increment revenues in the development area of an authority established in a city with a population of 600,000 or more can be used to pay for, or reimburse an advance for, costs associated with the land acquisition, preliminary site work, and construction of a catalyst development project.

[13] For purposes of calculating Catalyst Project Revenues, three taxing jurisdictions are relevant: the State, the City of Detroit School District, and the Wayne County Regional Education Service Agency ("RESA"). Pursuant to the DDA Act, the DDA is able to capture tax increment generated by certain levies imposed by these jurisdictions for purposes of financing qualified "Catalyst Project" within the Development Area (source: "City of Detroit Downtown Development Authority, Development Area No. 1, Tax Increment and Feasibility Report, prepared by MuniCap, Inc., dated December 3, 2014, page 9).

[14] MCL 125.1664(6) provides: Under a tax increment financing plan that includes a catalyst development project, an authority may pledge available tax increment revenues of the authority as security for any bonds issued to develop and construct a catalyst development project.

2. A contribution of $64.5 million by the Authority from its local tax increment revenues[15], payable pursuant to a schedule described in the EC CMA, as may be amended by the Authority from time to time. This amount will include all tax increment revenues attributable to Wayne County taxes in the 2013 Expansion Area for the duration of the 2014A Bonds, currently estimated at approximately $4,740,000. More specifically, the $64.5 million is the amount of DDA's contribution of local tax increment revenues (not Catalyst Revenues) to the Events Center Project for debt service on the tax exempt 2014A bonds.

The 2017 Amended DDA Plan also provides that the Series 2014B DDA Bond is secured by and will be repaid from certain concession fees payable to the DDA by OEEC under the EC CMA, which, over the term of the 2014B Bonds average approximately $11.5 million annually. The 2017 Amended DDA Plan states that the OEEC will be responsible for any and all cost overruns relating to the Events Center and that the obligations of any governmental parties with regard to debt service on the Events Center Tax Increment Revenue Bonds is limited to the amount stated in the 2017 Amended DDA Plan. The maintenance of the Events Center is primarily the responsibility of the OEEC, however, beginning in 2018, a reserve for Events Center repairs shall be established with an annual sum of $500,000 to be shared equally by OEEC and the DDA escalating at a rate of 4% per year to be placed in the reserve. Under the original DDA Plan the OEEC was solely responsible for repairs. The amended language includes the DDA as sharing 50 percent of the cost.[16]

### Estimated Completion Date

The Amended DDA Plan provides the completion date for construction of the Events Center anticipated to be September 2017.

### (b) Changes Regarding the Ancillary Development Project

The above referenced changes to the DDA Plan are those relative to the Events Center itself. Additional changes are proposed Under Section 407.11.2, *EC Ancillary Development Project* which addresses other projects involving the development, redevelopment, rehabilitation and repurposing of existing buildings and vacant lands located in portions of the Catalyst Development Area outside of the boundaries of the Events Center. Under the Project Description category for ancillary development, the Amended DDA Plan indicates the City and the EDC has conveyed title to its property in the Catalyst Development Area to the DDA. The amended language states the following:

> Such properties will be held by the Authority for development and transferred to Olympia Development of Michigan, LLC ("ODM") or its affiliate pursuant to a Master Development and Reimbursement Agreement ("MDA") between the

---

[15] For purposes of calculating Local Tax Revenues, four taxing jurisdictions are relevant: the City, the County, Wayne County Community College, and Huron-Clinton Metropolitan Authority ("HCMA"). Pursuant to the DDA Act, the DDA is able to capture tax increment generated by certain levies imposed by these jurisdictions for purposes of financing qualified improvements within the Development Area (source: MuniCap feasibility report).

[16] The amended language that provides that both the OEEC and the DDA share in the funding the Events Center repair reserve may be due to the fact the Events Center will be owned by the DDA, however no rational is provided.

7

Authority and ODM. In addition, any properties transferred to the Authority for the Events Center Project which ultimately are not included in the final configuration of the Events Center Project, including air rights, will be transferred to ODM under the MDA. Properties transferred to ODM by the Authority under the MDA must be subject to development proposals approved by the Authority within five (5) years following the completion of the Events Center, except that certain properties along Woodward Avenue must be subject to a development proposal approved by the Authority prior to December, 11, 2017.

This language has been added to the DDA Plan stating the DDA will transfer to ODM or its affiliate as set forth in the Master Development Reimbursement Agreement (MDA) and is applicable to those properties that are not incorporated in the construction of the Events Center. These properties will be transferred to ODM and are subject to development proposals approved by the DDA within 5 years following completion of the Events Center. However, those properties identified as part of the Ancillary Development Project that are along Woodward Avenue are required to be part of a development proposal subject to approval by the DDA prior to December 2017.

With regard to the developer of the Ancillary Development Projects, new language has been included that provides that if ODM submits, and the DDA approves, development proposals with an aggregate investment of at least $200 Million within five (5) years following the completion of the Events Center, and actually completes such projects, the DDA will reimburse eligible development costs of up to $74 million from available Catalyst Project Revenues, after the payment of all obligations payable with respect to the EC Tax Increment Revenue Bonds. This provision is required as part of the MOU between the DDA and ODM (DDA/OEEC Section II, *DDA Plan Amendment,*[17] which provides for the Catalyst Project Revenue to be increased from $62 million to $74 million to be available for reimbursement of eligible Ancillary Development Project cost.[18]

The 2017 Amended DDA Plan also identifies projects that are in the Ancillary Development Project area that have been approved by the DDA since the 2013 Amended DDA Plan:

- September of 2016:   A new building to expand the Little Caesars headquarters, proposed 234,000 square foot mixed use development is located Columbia and Woodward. Total investment is estimated at $150 million. This investment is expected to be attributed to ODM's $200 million commitment set forth in the MDA.

---

[17] According to the MOU between the DDA and OEEC, the Master Development and Reimbursement Agreement (MDA) dated December 11, 2014, provides that the Amended DDA Plan will reflect the change from $62 million to $74 million in Catalyst Project Revenue that is to be used for the reimbursement. The City is not a party to the MDA, the terms and conditions of the agreement were determined by the DDA and ODM. LPD reviewed the MDA which does provide that the maximum amount that can be reimbursed is $74 million. The MDA also provides that ODM's commitment to invest $200 million in the ancillary Development Area was a material inducement of the DDA to support the Catalyst Development Project and enter into the MOU, the CMA, the Bond Documents and the MDA.

[18] According to the 2017 Amended DDA Plan, "This amount has increased from $62 million since the 2013 Plan amendments pursuant to an agreement reached by the DDA, ODM, MSF, and the City prior to the approval by Detroit City Council of the 2013 Plan amendments but after the 2013 Plan amendments were formally submitted to the Detroit City Council for approval."

- <u>September of 2016:</u>    Proposed development plan related to the property located at Henry and Cass for the development of a new seven story above-grade parking structure approximately 530 spaces and 7,000 square feet of ground floor retail on Henry Street. The investment is estimated at $24.4 million. This investment is expected to be attributed to ODM's $200 million commitment set forth in the MDA.

- <u>July of 2016:</u>    Proposed development plan relating to the property located at 2771 and 2743 Woodward for the development of a new 120,000 square foot school of business for Wayne State University to be known as the Michael Ilitch School of Business. Total Investment is estimated at $59 million. This investment will not be attributed to ODM's $200 million commitment set forth in the MDA.

The estimated investment in the Ancillary Development Project area has been amended from at least $200 million to $259 million which reflects the estimated $59 million for the Ilitch business school as part of the investment in the area but not part of the required $200 million in investment that would trigger the $74 million reimbursement under the MDA. LPD notes that under the MDA it is the DDA that approves what developments are determined to be part of the investment that triggers the reimbursement. It should be further noted, even if the 2017 Amended DDA Plan is not approved the 2013 Amended DDA Plan would still provide $62 million of Catalyst Project Revenue as reimbursements. In any event, the Catalyst Project Revenue can only be used in the Catalyst Project Area.

With regard to the overall Catalyst Development Project financing; the private contribution is estimated at $723,800,000; the public contribution is $398,100,000; the overall financing is estimated at $1,121,900,000, as depicted in Table 2 below.

Table 2 also shows the private contribution at a rate of over 60 percent for the both Events Center Project and the entire Catalyst Development Project. Table 2 also shows the public contribution at a rate of over 35 percent.

In 2013, the private contribution was at a rate of 56 percent for the entire Catalyst Development Project versus the public contribution rate of 44 percent.

The greater level of private contribution in the 2017 Amended DDA Plan is due to an increased amount of private investment into the Events Center made by OEEC since 2013. Per the EC CMA, all cost overruns relative to the construction of the Events Center are borne by OEEC.

It is also important to note that of the $538.8 million OEEC is committing to spend on the Events Center, $200 million is covered by the DDA 2014B bond secured by concession revenue, and the remaining $338.8 million is coming from private financing.

[Rest of page is blank]

| Table 2 | | | |
| Catalyst Development Project | | | |
| Sources and Uses of Funds (in millions of dollars): | | | Private/ |
| | | | Public |
| Events Center: | | | Percent |
| Land acquisition costs, preliminary site work and | | | |
| construction of Events Center | | | |
|   Private Financing (ODM) | | $538.8 | 62.4% |
|   Public Financing: | | $324.1 | 37.6% |
|     Existing Catalyst Project Revenues | $34.8 | | |
|     Series 2014A DDA Bond | $250.0 | | |
|     Estimated net closing costs and debt services | | | |
|       services reserves | $4.9 | | |
| Events Center Subtotal | | $862.9 | 100.0% |
| | | | |
| EC Ancillary Development Project | | | |
| Land acquisition, demolition, construction, | | | |
| rehabilitation, infrastructure for EC Ancillary | | | |
| Development Project | | | |
|   Private Financing | | $185.0 | |
|   Public Financing (DDA Catalyst Project revenues) | | $74.0 | |
| EC Ancillary Development Project Subtotal | | $259.0 | |
| | | | |
| Overall Catalyst Development Project | | | |
|   Private Financing | | $723.8 | 64.5% |
|   Public Financing | | $398.1 | 35.5% |
| Catalyst Development Project Total | | $1,121.9 | 100.0% |

Under Section 408.2 *Statement of the Proposed Method of Financing the Development Plan*, the Amended DDA Plan reflect the changes with regard to the issuance of bonds:

> In December, 2014, the Authority issued its bonds to the MSF to secure the 2014A Bonds in the amount of $250,000,000 and 2014B Bonds in the amount of $200,000,000 in connection with the Events Center Project. It is anticipated that the Authority will issue its Series 2017 DDA Bonds in 2017 to generate an additional $34.5 Million in proceeds to support additional costs of the construction of the Events Center in connection with the commitment of the Detroit Pistons to relocate the Pistons home arena from the Palace of Auburn Hills to the Events Center. It is further anticipated that the Authority will issue additional tax exempt tax increment bonds prior to January 1, 2019 to refund the indebtedness represented by the Series 2014A DDA Bond and the Series 2017 DDA Bonds. Following such bond issuances, the maximum bonded indebtedness of the Authority represented by EC Tax Increment Revenue Bonds will be no higher than $310 million.[19]

---

[19] According to the Amended DDA Plan, "The maximum EC Tax Increment Revenue Bond indebtedness of $310 million is comprised of amounts anticipated to be necessary prior to January 1 2019 to (1) refund the Series 2014A

The amendment indicates the DDA will issue Series DDA Bonds 2017 to generate the $34.5 million for the modifications to the Events Center for the Pistons. The DDA intends to issue additional tax exempt tax increment bonds prior to January 2019 to refund the Series 2014A DDA Bond and the Series 2017 DDA Bonds. This in effect is the refinancing of the $250 million and the $34.5 million in public financing bond debt.[20]

With regard to the extension of the finance period on the bond indebtedness an additional five years from 2045-46 to 2050-51 as set forth under Section II of the PS&E/City MOU, the Amended DDA Plan provides:

> It is expected that the final tax increment financing program and the capture of tax increment within the present Development Area will have a duration of approximately 71 years from the date of its adoption, being a duration through fiscal year 2050-2051, in order to provide sufficient time for the Authority to meet its statutory and/or contractual obligations with respect to bonded indebtedness and its contractual obligations payable from tax increment or other revenues authorized pursuant to the Act and the Plan. While year 2051 is the projected Plan expiration date, the expiration of the Plan shall occur at the later of (i) the payment of the principal of, and interest on, all bonds issued pursuant to Section 16 of the Act, or the segregation of funds sufficient to make such payments, pursuant to Section 15 of the Act, specifically MCL 125.1665(2), or (ii) when the purposes for which this Plan was established are accomplished, including the payment of any then outstanding Obligations or Other Protected Obligations, each as defined in Section 1 of the Act, specifically MCL 125.1651(t) and (w), respectively.

As indicated the 2017 Amended DDA Plan shows the final tax increment financing program has been amended to reflect to have a duration of 71 years which is five additional years from the previous duration. As required in the both the PS&E/City MOU and the DDA/PS&E MOU, the Amended DDA Plan will "extend the term of the DDA Plan beyond the current expiration date of June 30, 2045".[21] The amendment reflects the change of duration from 1978-79 through 2045-46 to 1978-79 to 2050-51.

## II.    Cost/benefit Considerations relative to the Pistons' move to the Events Center

Council should note that LPD will focus primarily on the cost/benefit analysis conducted by the Detroit Economic Growth Corporation (DEGC) regarding the Pistons' move to the City of Detroit relative to the relocation of the Pistons corporate headquarters and practice facility to the City of

---

DDA Bond and the Series 2017 DDA Bonds; (2) make any necessary deposits to the debt service reserve and capitalized interest funds for said bonds; (3) pay the costs for issuance of the bonds; and (4) fund other lawful purposes under the Act and the Plan; provided, however, that such maximum does not include original issuance premiums."

[20] The DDA has indicated it intends to refinance the Series 2014A DDA Bonds and Series 2017 DDA Bonds at the end of 2018. It was indicated that to refinance prior to December 2018 would trigger a penalty amounting to approximately $15 million. The DDA also indicated that the need alone to refinance bonds would not necessitate a DDA Plan Amendment requiring City Council approval as long as the previous Plan revision adequately covered the expenses.

[21] See PS&E/City MOU, Section II, B and the DDA/PS&E MOU Section IX, dated November 2016.

Detroit. PS&E is requesting for three tax incentives associated with this relocation: a PA 210 Commercial Rehabilitation Real Property tax abatement; a PA 328 New Personal Property tax abatement; and Brownfield Redevelopment Authority tax increment financing associated with the remediation of the brownfield site where the Pistons Headquarters/Practice Facility would be built.

The cost of tax incentives described above will be offset primarily by municipal income taxes generated by the relocation of 135 jobs from the Pistons organization and the 15 players to the City of Detroit from Auburn Hills, Michigan, along with the creation of indirect jobs and construction jobs. The DEGC projects a net benefit of $9.3 million to the City of Detroit relative to the Pistons Headquarters/Practice Facility relocation project. LPD will provide a review of the cost/benefits associated with this project in a separate report that will be issued to this Honorable Body shortly.

Regarding the relocation of Pistons home games (41 games) to the Events Center, as described previously the City of Detroit through the DDA is investing $34.5 million in public dollars through new bond indebtedness via the 2017 Amended DDA Plan to add improvements to the Events Center in order to accommodate an NBA team and meet NBA standards. The DEGC considers the $34.5 million investment an inducement for the relocation of the Pistons organization to the City of Detroit[22].

According to the University of Michigan Center for Sport and Policy, ticket sales (including all luxury products) from the Pistons games, and entertainment revenue (assuming 37 shows relocating from the Palace of Auburn Hills to the Events Center) will generate at least $90 million annually in new spending in downtown Detroit[23]. Although this figure appears significant, LPD feels that it is very likely that much of this additional spending would be captured by PS&E in the form of concession revenue.

It should also be noted that LPD was unable to review the detailed assumptions, including the projection of resident versus non-resident season ticket holders, the multiplier effects for direct spending in restaurants, retail outlets, etc. and any indirect spending, and figures associated with

---

[22] LPD raised with the DEGC representatives the issue of the Pistons paying property taxes at the Palace of Auburn Hills versus not paying property taxes when playing at the Events Center which is owned by the DDA. The DEGC representatives' responded by indicating "it is pretty much impossible to find any professional sports teams paying property taxes in facilities built in the last 20 years. The teams will pit one city against another with the threat of a move. Cities are concentrating on other taxable revenue raised (sales, payroll) as the positives of building the facilities". It should also be noted that the PS&E will be paying full property taxes once the PA 210 Real Property tax abatement and the PA 328 New Personal Property tax abatement expire after 10 years.

[23] "The Value of the Relocation of the Detroit Pistons to Downtown Detroit for the City of Detroit", U of M Center for Sport and Policy, School of Kinesiology, Dr. Mark S. Rosentraub and Ms. Madelaine Moeke, dated September 8, 2016. According to this report, the economic value of ticket sales was based on 41 home games, 4 pre-season games, and 5 playoff games and "average annual attendance" was based on an annual average from five years of operation. Also according to this report, entertainment revenue was based on the hosting of 37 shows with a projected $20.2 million in entertainment revenue, and this projection was provided by Palace Sports and Entertainment. A representative of PS&E informed LPD that during the drafting of the U of M's economic impact study, PS&E conservatively estimated that 37 events would shift from the Palace to the Little Caesars Arena (Events Center). The representative also communicated that while the future of the Palace has yet to be determined, and depending on the schedules of the Pistons and Red Wings, PS&E believes that Little Caesars Arena has the potential to host many more events based on the number of events available in the area.

12

the U of M economic benefit study. As a result, LPD cannot determine the reasonableness of this projection.

## III.    Other Amendments to DDA Plan Development Area No.1

As previously indicated there are other amendments to the DDA Plan with regard to the other projects in Development Area No.1 as well as minor housekeeping changes.

Other Projects where Tax Increment Revenue Funding is adjusted:

(a) **Convention Facility Area Public Improvements:** The 2017 Amended DDA Plan shows that an additional $200,000 per year for fiscal years 2018-2019 through 2022 -2023 for a total of $980,000 was added to support Holiday Lighting/Decorating Program for those years.

(b) **Tiger/Lions Stadia Complex:**       The 2017 Amended DDA Plan shows the allocation for repairs and maintenance has increased by $1.45 million due to extension of the Plan assuming the Tigers exercise all available extension options under the Concession and Management Agreement for Comerica Park.

(c) **Housing/Office/Retail Development and Absorption Fund:** The 2017 Amended DDA Plan shows the allocation to accommodate construction and/or rehabilitation of downtown facilities under the Housing/Office/Retail Development program is increased by $119.31 million over the life of the Plan. There are no specific plans in process for these additional funds at this time. This fund is used to stimulate housing, office and retail activities by providing construction and renovation loans, as well as other assistance such as parking. For example, in 2015, the DDA Board approved $11.63 million from this fund to Ally Financial to assist in the relocation to the City of 600 employees. Ally's total investment exceeded $50 million. In 2010, the DDA Board approved a $30 million allocation to Blue Cross when the relocated 3,000 employees to the City. Blue Cross spent $68 million in renovation costs.

According to the DDA, by extending the TIF plan, the DDA has additional revenues that are needed to be allocated within the plan. DDA's standard operating procedure has been to fund this line item along with Land Assemblage and to reallocate from these line items as specific economic development projects not anticipated by the Plan arise. Then, at the time of the next Plan amendment, the specific projects are added to the Plan.

(d) **Land Assemblage:** The 2017 Amended DDA Plan shows an additional $119.31 million in tax increment funding over the life of the Plan. Currently there are no specific plans before the board for these additional funds. The DDA uses the Land Assemblage fund by acquiring buildings or vacant land when necessary to either address blighted conditions or to assemble land into attractive parcels for redevelopment. As an example, the DDA Board authorized use of these funds for the Quicken Loans Headquarters project.

(e) **Ally Financial:** The 2017 Amended DDA Plan shows that in 2015 Ally Financial consolidated its regional operation to downtown Detroit, relocating its headquarters to 500 Woodward Ave and signed a 12 year, nine month lease for approximately 321,000 square

feet of Class A office space. The consolidation resulted in retaining 700 employees and relocation of an additional 600 employees to Detroit and a total investment exceeding $50 million. The DDA Board approved a resolution assigning $11.63 million from the Housing/Office/Retail Development and Absorption Fund to offset costs associated with employee parking over the term of Ally's almost 13-year lease. The private investment is $38,370,000.

(f) **EC Repair Fund:** The 2017 Amended DDA Plan adds $2.34 million to the $12.25 million arena repair fund due to the extension of the plan through 2051.

(g) **Closing Costs/Catalyst Bond Reserve:** The closing costs and bond reserves increase by $10.1 million in the 2017 Amended DDA Plan as a result of the 2017 DDA bond sale and 2019 DDA bond refinancing transactions.

(h) **DDA Operating Fund:** From fiscal year 2046 through 2051, the operating fund would see an annual increase of $750,000 for a total of $4.5 million in the 2017 Amended DDA Plan.

(i) **Michigan Avenue Garage Debt Service:** The debt service will decrease by $1.36 million to reflect lower DDA debt service requirements in the 2017 Amended DDA Plan.

(j) **Rolling Defeasance 96/98 Debt Service:** This line item decreases by $2.21 million to reflect lower DDA debt service requirements in the 2017 Amended DDA Plan.

(k) **Debt Service (Catalyst) 2014/2017/2019:** Between the additional $34.5 million in bonds and refinancing in 2017 and 2019 with conservative estimates on future interest rates as well as the extension through 2051 it is anticipated that debt service will increase by $151.56 million in the 2017 Amended DDA Plan.

Other Projects amended to showing current status/ No Adjustment to Tax Increment Revenues:

(a) The 2017 Amended DDA Plan shows that on June 26, 2013, the DDA expanded Development Area No, 1 to accommodate the Catalyst Development Project. The Development Area No. 1 boundary was expanded north of the Fisher Freeway and west of Woodward Avenue.

(b) The 2017 Amended DDA Plan shows two publicly owned buildings, 1145 and 1212 Griswold have been redeveloped into mixed-use including residential, office and commercial A third publicly owned building, 1249 Griswold (a/k/a the Farwell Building) is currently being redeveloped into mixed-use including residential, retail and restaurants and is slated to be open in 2018.

(c) The 2017 Amended DDA Plan shows JLA is to be demolished and the 8.6 acre site is expected to be redeveloped into mixed-use including residential, retail, and a hotel. It should be noted that in 2014 the State's Michigan Strategic Fund (MSF) approved an economic assistance award of not to exceed to $6 million for the demolition of the JLA based on a preliminary estimate provided by the DEGC of the JLA demolition cost. This award can be used after the Detroit Red Wings relocate to the new Events Center. The

14

MSF would be reimbursed for the economic assistance award through a brownfield plan associated with the JLA site approved by City after demolition.

(d) Monroe Cadillac Mixed Use Development: The 2017 Amended DDA Plan shows that in November 2016 the DDA approved development plans by Rosko Development, LLC (Affiliate of Bedrock Real Estate Services). The Plan includes (1) the surface parking lot bounded by Monroe, Cadillac Square, Farmer and Bates; (2) the former Bates Garage located at 126 Monroe; and (3) the National Theater Site owned by the City located at 118 Monroe. The first of two phases will be a mixed use project constructed on Monroe Block that consist of at least 600,000 square feet of mixed used of which at least 35,000 square feet of ground-floor retail and an office tower of at least 20 stories and below grade parking. The second phase to be constructed on the Bates and National Theater sites consisting of 225,000 square feet of residential and includes 25,000 square feet of ground-floor retail and a residential tower of at least 16 stories.

(e) Campus Martius Condominium Unit No. 2: The 2017 Amended DDA Plan shows that in 2007 the DDA approved a development agreement between the DDA and Rosko Development, LLC, granting development rights to certain DDA owned properties to Rosko including the former Hudson's store site as incentive for Quicken Loans to relocate is operations and 2,000 employees to downtown Detroit. In 2017 the developer submitted a plan consisting of approximately 1.5 million square feet, including a 42 story, 250 unit residential tower and approximately 840 square feet of mixed use, commercial, and civic space and 700 below grade parking spaces. Financing for the projects depends, in part, on the approval by the state legislature of certain amendments to Public act 381 of 1996 Brownfield Redevelopment Financing Act. The proposed development plan anticipates a total project cost of approximately $766 Million, approximately $75 Million of which would be through public financing tools other than DDA tax increment financing.

(f) Harmonie Park Acquisition/Rehabilitation (currently Paradise Valley Cultural and Entertainment District): The 2017 Amended DDA Plan shows that in 2015 the DDA released a request for Proposals from qualified developers to acquire and redevelop five DDA properties within the District. The DDA selected the five development teams in 2016 to redevelop the properties for an estimated $52 million. Each development team has agreed to form, participate and support the operation of a non-profit 501(c)(3) called the Paradise Valley Conservancy for at least ten years following completion of the construction. The purpose of the Conservancy is to provide programming for the Paradise Valley Cultural and Entertainment District's public spaces.

(g) Michigan Avenue Garage: The 2017 Amended DDA Plan shows the DDA granted development rights for the air rights on top of the garage to Griswold Project, LLC for the development of The Griswold Apartments, an 80 unit, five-story residential project which opened in 2017.

It is also important to note that even though this item is not a part of the 2017 Amended DDA Plan, Olympia Development of Michigan, LLC (ODM) has entered into an agreement on a security plan for the Events Center with the Detroit Police Department. This letter agreement, dated April 15, 2014, indicates that ODM as set forth in the EC CMA has agreed to pay reasonable costs that are related to and germane to law enforcement/security both inside and outside of the Events Center.

ODM also anticipates entering into a "secondary employment agreement" with respect to the acquisition of the security workforce. ODM will also be addressing and paying for non-law enforcement services, usually provided for by ushers or internal proprietary security colleagues.

**Estimated Revenue Changes in the 2017 Amended DDA Plan**

Table 3 below reflects the estimated revenue changes from the 2013 Amended DDA Plan to the 2017 plan.

| Table 3<br>2017 Amended DDA Plan Estimated Revenue Changes through 2051<br>(In Millions of Dollars) | | | |
|---|---|---|---|
| **Estimated Revenue Description** | **2013 TIF**<br>**Plan** | **2017 TIF**<br>**Plan** | **Change** |
| Estimated Catalyst Project Revenues for Event Center (School Capture)(1) | $558.92 | $726.56 | $167.64 |
| Catalyst Revenue returned to state/forgiven | $34.75 | $33.68 | ($1.07) |
| Estimated Annual Local Tax Increment Revenues due to 2051 extension | $547.74 | $795.70 | $247.96 |
| Net Bond Proceeds 2017 | $0.00 | $35.57 | $35.57 |
| Net Bond Proceeds 2019 | $0.00 | $15.51 | $15.51 |
| Anticipated Loan Repayment Receipts | $2.63 | $8.36 | $5.73 |
| Anticipated Lease Payment Receipts | $5.16 | $0.00 | ($5.16) |
| Adjustments to Michigan Avenue Garage Net Receipts | $9.81 | $8.68 | ($1.13) |
| Adjustments in Sale of Real Estate Receipts | $1.86 | $8.27 | $6.41 |
| Interest on TIF and Bond Revenues through 2051 | $1.23 | $1.89 | $0.66 |
| | | | |
| **Total 2017 Amended DDA Plan Estimated Revenue Changes** | | | $472.12 |
| Less: Total 2017 Amended DDA Plan Project Expenditure Changes | | | |
| (from Table 1) | | | $472.06 |
| Difference: Ability of Revenue Changes meeting Project Expenditure Changes | | | $0.06 |
| (1) "Catalyst Project Revenues" represent school property tax incremental revenues captured by the<br>DDA in the TIF/Development Area 1. | | | |

Table 3 reflects the changes in estimated revenues over the life of the 2017 Amended DDA Plan, which expires in FY 2050-2051. Importantly, Table 3 shows that total estimated revenues changes in the plan exceed total project expenditure changes in the plan by $60,000; reflecting that estimated revenues are projected to meet anticipated project expenditure requirements over the life of the plan, or over the next 34 years.

The primary adjustments to tax increment revenues include:

**(a) Estimated Catalyst Project Revenues for the Events Center Project (School Capture)**

Table 3 shows that the 2017 Amended DDA Plan estimates an increase of $167.64 million in Catalyst Project Revenues that will be generated over the life of the plan for the Events Center Project. "Catalyst Project Revenues"[24] represent school property tax incremental revenues captured by the DDA in the existing and expanded Development Area 1 to help make MSF bond debt service payments over the 30-year bond period for the project. The reason for the expected increase is addressed in section (c) Reasons for Anticipated Tax Incremental Revenues below.

**(b) Estimated Annual Local Tax Increment Revenues due to 2051 extension**

Table 3 shows that the 2017 Amended DDA Plan includes adjustments of the estimated annual local tax increment revenues to more accurately reflect taxable values and millage rate changes, which total $247.96 million in additional revenues over the life of plan from the 2013 plan[25]. These incremental tax revenues will be used to provide resources for other DDA project expenditures throughout the life of the plan.

The DDA will capture local (City of Detroit, Detroit Library, Wayne County-with exception of Wayne County taxes captured from the expanded Development Area 1 for the Events Center Project, and Huron-Clinton Metropolitan Authority (HCMA) incremental taxes from the existing and expanded Development Area No. 1 over the life of the plan. The reason for the expected increase is addressed in section (c) Reasons for Anticipated Tax Incremental Revenues below.

**(c) Reasons for Anticipated Tax Incremental Revenues**

The Catalyst Project Revenues and the local tax incremental revenues are anticipated to increase over the life of the 2017 Amended DDA Plan for the following reasons:

1. Tax incremental revenue ebbs and flows have benefited from the 2000 stadium developments and other developments but suffered during the real estate market crash in 2008. However, the DDA property values have rebounded measurably since 2008 due to major developments, including the Compuware, Campus Martius, Quicken Loans, Blue

---

[24] Catalyst Project Revenues comprise the DDA tax incremental capture of City of Detroit School District, State Education and Wayne County Regional Education Service Agency (RESA) property tax mills. The City of Detroit School District property tax mills encompass 18 mills for operating and 13 mills for debt service. According to the State Department of Education, the State of Michigan will be responsible for covering any shortfall in the per pupil school allowance for the Detroit Public Schools that is paid by the State's School Aid Fund, if such shortfall is caused by the DDA's capture of school property taxes for DDA bond debt service purposes over the 30-year bond period under PA 396 of 2012. The per pupil school allowance amount is a product of per-pupil funding allowance from local school operating taxes based on 18 mills from non-homestead properties plus per-pupil funding from the School Aid Fund. Meanwhile, LPD understands the Detroit Public Schools is currently capturing sufficient property taxes to cover its debt service payments. Whenever the Detroit Public Schools issues debt in the future it will have to take into consideration any potential negative impacts from DDA's capture of incremental property taxes from school debt mills in the DDA TIF area.

[25] It is important to note that the 2017 Amended DDA Plan anticipates a total of $795.7 million in local tax incremental revenue will be generated over the life of the plan, and that $64.5 million of this total will be allocated to the Events Center Project based on a payment schedule to help make MSF bond debt service payments over the 30-year bond period of the project.

17

Cross Blue Shield of Michigan and Catalyst Development projects, as well as from other real estate development projects.

2. The DDA experienced significant growth from the period of 2014 through 2016. Catalyst Revenue growth factors ranged from 4.4% (2015), 24% (2016) and 16% over projected revenue (2016). Catalyst Revenue is anticipated to grow from 4 to almost 7% from 2017 through 2025 following this trend.

3. Regarding local tax increment revenue, the growth factors ranged from 5.8% (2015), 19% (2016) and 11% over projected revenue (2016). Local tax increment revenue is anticipated to grow from 4 to almost 9% from 2017 through 2025 following this trend.

4. In past DDA TIF plans, the DDA used very conservative growth assumptions, in the neighborhood of 1 to 2%, regarding taxable values and millage changes, and would use zero growth assumptions in outlier years of the DDA plan. However, the 2017 Amended DDA Plan uses growth assumptions in its projected tax incremental revenue primarily based on "Scenario C" from a 2014 study conducted by its feasibility consultant, MuniCap. Scenario C assumes:

    a. Property values currently under appeal are assumed to be resolved at permanently lower values for purposes of ad valorem taxation;
    b. Property abatements expire according to statutory expectations;
    c. Levied taxes are collected, on average, at a rate of 98%, with the remaining 1.5% treated as a permanent loss;
    d. Property values do not increase with inflation;
    e. Real property tax rate remains static at current levels in future years;
    f. An increase in property values is included to account for recently completed improvements on certain parcels (Chase Building: $14 million market value investment and First National Building: $23.4 million market value investment) within the Development Area not reflected in current assessed values and assumed to be first reflected in Fiscal Year 2016 assessed values.
    g. Values are increased based upon fulfillment of the Concessionaire Ancillary Development Commitment. Scenario C assumes the entire $200 million in investments will occur in the EC Ancillary Development Project area over a five year period. As mentioned previously, two projects are already underway: 1) the $150 million Little Caesars Headquarters project and 2) the $24.4 million Henry Street Garage project. In addition, the Wayne State University Michael Ilitch Business School investment of $59 million is not included in the $200 million ancillary development commitment, but nonetheless will help to increase property values in the DDA Development Area.
    h. In addition to Scenario C, the DDA includes an annual growth factor of 1.15% from 2028 through 2051. The DDA feels this is well less than the average MuniCap increases and believe it presents a conservative estimate, while still allowing for some growth. Additional growth is anticipated from potential sizable developments on the Old Hudson's Site, on the Monroe Project site, in the EC Ancillary Development Area, in the Harmonie Park area (Paradise Valley project), and other potential development.

18

Based on the above information, the growth assumptions used to project future tax incremental revenues over the life of the 2017 Amended DDA Plan appear reasonable[26].

### (d) Net Bond Proceeds 2017

Table 3 shows that the 2017 Amended DDA Plan anticipates receiving $35.57 million from net 2017 DDA bond proceeds, of which $34.5 million would be used for the Pistons project at the Events Center with the difference of $1.07 million being used for bond closing costs.

### (e) Net Bond Proceeds 2019

Table 3 shows that the 2017 Amended DDA Plan anticipates receiving $15.51 million from net 2019 DDA bond proceeds and will be used to fund the debt service reserve account and pay closing costs.

### (f)  Adjustments to Anticipated Loan Repayment Receipts

Table 3 shows that the 2017 Amended DDA Plan anticipates receiving an increase of $5.73 million in loan repayments due to the fact that the DDA had received partial payments on some loans it had previously reserved or written off.

### (g)  Adjustments to Anticipated Lease Payment Receipts

Table 3 shows that the 2017 Amended DDA Plan reflects a $5.16 million removal in lease receipts since the DDA expected to get a lease payment from Ford Field, however, the payer is entitled to take a credit for property taxes paid and costs incurred against that payment.  Payer's costs have been higher than originally anticipated.  No lease payments are likely to ever be collected so it has been removed.

### (h) Adjustments in Sale of Real Estate Receipts

Table 3 shows that the 2017 Amended DDA Plan shows an increase of $6.41 million in sales of real estate receipts based on sales of DDA buildings since 2013 Plan in Capital Park and along Woodward Avenue and anticipated sales of Paradise Valley properties and properties along Broadway.

### Conclusion

The Amended DDA Plan appears to be in line with the representations that have been made in the PS&E/City MOU as well as the terms set forth in the DDA/OEEC MOU regarding the required changes that are to be reflected. LPD reiterates that during the approval of the PS&E/City MOU representations were made that the agreement containing the community benefits from the Pistons Practice Facility and Headquarters would be presented for approval at or before the Amended DDA Plan. City Council should seek to ensure the representations are fulfilled.

---

[26] It is important to note that MuniCap does provide some limitations to its assumptions, including: millage rates could change; assessed values over time can change significantly either higher or lower than values in previous years; property values can be appealed; there could extension of tax abatements, future property collection rate could be below 98.5%; and the local, state and national economy could deteriorate

Finally, LPD reasserts it belief that a comprehensive review by the DDA should be undertaken with regard to its initial findings back in 1978-79 in determining the areas within the District identified as sites in need of investment or of anticipated development expected to require tax increment financing. At some point over the years the development of Downtown Detroit should reach a point in which the taxes generated from the properties within the District will be able to go back to the taxing jurisdictions to be utilized for services to their respective constituencies.

# REFERENDUM PETITION

We, the undersigned qualified and registered electors, residents in the

☑ City
☐ Township
☐ Village of ) DETROIT _____ in the County of _____ WAYNE _____

CHECK ONE

A referendum to repeal and nullify ordinance no. 19-17. This vote will prevent the Detroit

FOR THE FULL TEXT OF THE ORDINANCE SUBJECT TO A REFERENDUM VOTE, SEE THE RE

from capturing $34.5 million in taxes that was designated for Detroit Public Schools operating purposes. Instead, the City approved using these fu

additional costs of the Pistons move.

**WARNING—A PERSON WHO KNOWINGLY SIGNS THIS PETITION MORE THAN ONCE, SIGNS A NAME OTHER THAN HIS OR HER OWN, AND REGISTERED ELECTOR, OR SETS OPPOSITE HIS OR HER SIGNATURE ON A PETITION, A DATE OTHER THAN THE ACTUAL DATE IS VIOLATING THE PROVISIONS OF THE MICHIGAN ELECTION LAW.**

| | SIGNATURE | PRINTED NAME | STREET ADDRESS | ZIP C |
|---|---|---|---|---|
| 1. | Joyce M Dallas | Joyce M. Dallas | 2516 S. Deacon | 4821 |
| 2. | Chloe Martin | Chloe Martin | 506 Westminster | 4828 |
| 3. | | 476 Millking Blvd. | 4820 |
| 4. | | 654 Millking Blvd | 4820 |
| 5. | Dorothy Robinson | Dorothy Robinson | 7800 Eighth Avenue #1232 | 4820 |
| 6. | | Warren Sailleton | 5591 Underwood | 4820 |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |

## CERTIFICATE OF CIRCULATOR

The undersigned circulator of the above petition asserts that he or she is 18 years of age or older and a United States citizen; that each signature on the petition was signed in his or her presence; that he or she has neither caused nor permitted a person to sign the petition more than once and has no knowledge of a person signing the petition more than once; and that, to his or her best knowledge and belief, each signature is the genuine signature of the person purporting to sign the petition, the person signing the petition was at the time of signing a registered elector of the City or Township listed in the heading of the petition, and the elector was qualified to sign the petition.

☐ If the circulator is not a resident of Michigan, the circulator shall make a cross [X] or check mark [✔] in the box provided, otherwise each signature on this petition sheet is invalid and the signatures will not be counted by a filing official. By making a cross or check mark in the box provided, the undersigned circulator asserts that he or she is not a resident of Michigan and agrees to accept the jurisdiction of this state for the purpose of any legal proceeding or hearing that concerns a petition sheet executed by the circulator and agrees that legal process served on the Secretary of State or a designated agent of the Secretary of State has the same effect as if personally served on the circulator.

**WARNING—A CIRCULATOR KNOWINGLY MAKING A FALSE STATEMENT IN THE ABOVE CERTIFICATE, A PERSON NOT A CIRCULATOR WHO SIGNS AS A CIRCULATOR,OR A PERSON WHO SIGNS A NAME OTHER THAN HIS OR HER OWN AS CIRCULATOR IS GUILTY OF A MISDEMEANOR.**

## CIRCULATOR - DO NOT SIGN OR DATE
## CERTIFICATE UNTIL AFTER CIRCULATING PETIT

(Signature of Circulator)

(Printed Name of Circulator)

(Complete Residence Address (Street and Number))

(City or Township, State, Zip Code) [Do n

(County of Registration, if Registered to Vote, of a Circulator who is not a F

Michigan Election Resources - Form No. 2010 - 2015 Revision - Approved by State Director of Elections

# REFERENDUM PETITION

☑ City
☐ Township
☐ Village of
**CHECK ONE**

residents in the

**DETROIT** _____ in the County of _____ **WAYNE** _____ State of Michigan, respectively petition for

A referendum to repeal and nullify ordinance no. 19-17. This vote will prevent the Detroit Downtown Development Authority

that was designated for Detroit Public Schools operating purposes. Instead, the City approved using these funds to pay Little Caesars Arena for

FOR THE FULL TEXT OF THE ORDINANCE SUBJECT TO A REFERENDUM VOTE, SEE THE REVERSE SIDE OF THIS PETITION.

ONLY SIGNS THIS PETITION MORE THAN ONCE, SIGNS A NAME OTHER THAN HIS OR HER OWN, SIGNS WHEN NOT A QUALIFIED

GNS OPPOSITE HIS OR HER SIGNATURE ON A PETITION, A DATE OTHER THAN THE ACTUAL DATE THE SIGNATURE WAS AFFIXED,

THE MICHIGAN ELECTION LAW.

| PRINTED NAME | STREET ADDRESS | ZIP CODE | DATE OF SIGNING MONTH | DAY | YEAR |
|---|---|---|---|---|---|
| Joyce M. Dallas | 2516 S. Deacon | 48217 | 8 | 21 | 2017 |
| Chloe Matthews | 506 Western S Tr. | 48303 | 5 | 21 | 2017 |
| 470 Milking Blvd | 470 Milking Blvd | 48201 | 8 | 21 | 2017 |
| Ronnie Johnson | 7800 East Gent #1322 | 48214 | 8 | 21 | 2017 |
| Garrett Sautter | 5591 Underwood | 48104 | 5 | 21 | 2017 |

CIRCULATOR – DO NOT SIGN OR DATE
CERTIFICATE UNTIL AFTER CIRCULATING PETITION.

Note the number of signers you got
on this petition paper # **5**

**AGE OF CIRCULATOR**

that he or she is 18 years of age or older and a United States citizen; that each
ee; that he or she has neither caused nor permitted, a person to sign the petition
ng the petition more than once; and that, to his or her best knowledge and belief,
urporting to sign the petition, the person signing the petition was at the time of
n the heading of the petition, and the elector was qualified to sign the petition.

□ circulator shall make a cross [X] or check mark [✓] in the box provided,
and the signatures will not be counted by a filing official by making a cross or
ator asserts that he or she is not a resident of Michigan and agrees to accept
roceeding or hearing that concerns a petition sheet executed by the circulator.
Signor or a designated agent of the Secretary of State has the same effect as if

Printed Name of Circulator) _____

Signature of Circulator) _____

Complete Residence Address (Street and Number) _____

(City or Township, State, Zip Code) _____ Det _____ MI 48201

[Do not enter a post office box]

(County of Registration, if Registered to Vote, of a Circulator who is not a Resident of Michigan)

(Date) _____ 8 23 17

AKING A FALSE STATEMENT IN THE ABOVE CERTIFICATE, A
S A CIRCULATOR, OR A PERSON WHO SIGNS A NAME OTHER
GUILTY OF A MISDEMEANOR.

* State Director of Elections

# City of Detroit
## DEPARTMENT OF ELECTIONS

JANICE M. WINFREY, *City Clerk*
*Chairperson, Election Commission*

**DANIEL A. BAXTER**
*Director*

**GINA C. AVERY - WALKER**
*Deputy Director*

*2978 W. Grand Blvd.*
*Detroit, Michigan 48202-3069*

*(313)876-0190  Fax (313)876-0053*

August 23, 2017

Lucinda J. Darrah
492 Peterboro
Detroit, MI  48201

Re:    Notice of Rejection of Untimely Petitions

Dear Ms. Darrah:

Earlier today, you attempted to file petition signatures for a referendum of the Detroit City Council's approval of financing for the Detroit Pistons move back into the City.

The Detroit City Council voted to approve financing for the Pistons move on June 20, 2017. The vote of approval was given immediate effect.  The resolution of approval was published on July 5, 2017.  Section 12-103 of the Detroit City Charter provides that referendum petitions "[m]ust be filed with the City Clerk before the ordinance on which the referendum is sought, takes effect or, where the ordinance is given immediate effect, within 30 days after its effective date."

The deadline for filing your petitions with the City Clerk to appear on the November 7, 2017 General Election ballot, was **August 7, 2017**.  That date has long-since passed.
Because your petitions are untimely, they are hereby rejected by the City Clerk's Office.

Very truly yours,

Daniel A. Baxter
Director

c:     Hon. Janice M. Winfrey, Chair, Election Commission
       Hon. Brenda Jones, Election Commissioner
       Hon. Melvin Butch Hollowell, Election Commissioner

# WRITE-IN CANDIDATE
## DECLARATION OF INTENT

_City of Detroit_
(NAME OF CITY, TOWNSHIP, VILLAGE OR SCHOOL DISTRICT)

As a write-in candidate for public office, you must file this form no later than 4:00 p.m. on the second Friday immediately preceding the election. You may have additional filing obligations under Michigan's Campaign Finance Act (P.A. 388 of 1976). Ask your filing official for further information.

As a write-in candidate for a precinct delegate position, you must file this form with the clerk of your city or township of residence no later than 4:00 p.m. on the first Friday immediately preceding the August primary. As an alternative, you may file this form with your board of election inspectors on the day of the August primary any time prior to the close of the polls.

Name _Lucinda J. Darrah "Cindy_
(Print or Type)

Residence Address _492 Petersboro_ _____ (Post Office) _____ _48201_
(Street Address) (Zip Code)

[✓] City or [ ] Township of _Detroit_

I am registered and qualified to vote at this address: [✓] Yes [ ] No   Birth Date _6, 20, 1944_

Home Phone ( _313_ ) _414 5181_   Business Phone ( ____ ) ____

DATE OF ELECTION:   Primary ___/___/___   General _Tues. November 7, 2017_

OFFICE SOUGHT: _Mayor of Detroit_

[ ] District No. (if any) _____   [ ] Precinct No. (if Precinct Delegate Candidate) _____

[ ] Partisan Office -- Party* _____   [ ] Nonpartisan Office
(*NOTE: Required for partisan primary election only)

TERM:   [✓] Regular   [ ] To Fill Vacancy - Term Ending _____   [ ] Other _____

## JUDICIAL CANDIDATES ONLY:

[ ] Incumbent Position - Place a check in this box if you are running for a judicial office for which the incumbent is seeking reelection.

[ ] Non-Incumbent Position - Place a check in this box if you are running for a judicial office for which the incumbent is not seeking reelection.

[ ] New Judgeship - Place a check in this box if you are running for a newly created judicial seat.

By signing this affidavit, I swear the statements made above are true and do hereby declare my intent to seek the above elective office as a write-in candidate.

SIGNATURE OF WRITE-IN CANDIDATE: _Lucinda J Darrah "Cindy"_

Subscribed and sworn to by _Lucinda J. Darrah "Cindy"_ Name of Notary: _MOHAMMED K HUSAN_

before me on the _19th_ day of _Aug._ , _2017_   Notary Public, State of Michigan, County of _Wayne_

_Md. Kamran Husan_   My commission expires _Nov. 1 2018_

Signature of notary public   Acting in the County of _Wayne_

| OFFICE USE ONLY | |
|---|---|
| OFFICE CODE_____ | DATE OF FILING___/___/___ |
| CFR I.D._____ | RECEIVED BY _____ |

Revised 02/2007

TY CLERK 17 AUG 2017 PM 2:40

# WRITE-IN CANDIDATE
## DECLARATION OF INTENT

*City of Detroit*

(NAME OF CITY, TOWNSHIP, VILLAGE OR SCHOOL DISTRICT)

As a write-in candidate for public office, you must file this form no later than 4:00 p.m. on the second Friday immediately preceding the election. You may have additional filing obligations under Michigan's Campaign Finance Act (P.A. 388 of 1976). Ask your filing official for further information.

As a write-in candidate for a precinct delegate position, you must file this form with the clerk of your city or township of residence no later than 4:00 p.m. on the first Friday immediately preceding the August primary. As an alternative, you may file this form with your board of election inspectors on the day of the August primary any time prior to the close of the polls.

Name_ Lucinda J. Darrah "Cindy"

(Print or Type)

Residence Address_ 492 Peterboro _____ 48201

(Street Address)          (Post Office)          (Zip Code)

[✓] City or [ ] Township of Detroit

I am registered and qualified to vote at this address: [✓] Yes [ ] No          Birth Date_____/____/____

Home Phone (313) 414 5181          Business Phone (____) _____

**DATE OF ELECTION:**   Primary ____/____/____   General Tuesday November 7, 2017

**OFFICE SOUGHT:** Detroit City Clerk

[ ] District No. (if any) _____   [ ] Precinct No. (if Precinct Delegate Candidate) _____

[ ] Partisan Office -- Party* _____   [ ] Nonpartisan Office

(*NOTE: Required for partisan primary election only)

**TERM:** [✓] Regular   [ ] To Fill Vacancy - Term Ending _____   [ ] Other _____

**JUDICIAL CANDIDATES ONLY:**

[ ] Incumbent Position - Place a check in this box if you are running for a judicial office for which the incumbent is seeking reelection.

[ ] Non-Incumbent Position - Place a check in this box if you are running for a judicial office for which the incumbent is not seeking reelection.

[ ] New Judgeship - Place a check in this box if you are running for a newly created judicial seat.

By signing this affidavit, I swear the statements made above are true and do hereby declare my intent to seek the above elective office as a write-in candidate.

**SIGNATURE OF WRITE-IN CANDIDATE:** *Lucinda J Darrah "Cindy"*

Subscribed and sworn to by Lucinda J. Darrah "Cindy"   Name of Notary: MOHAMMED K HUSAN

before me on the 17th day of Aug. , 2017   Notary Public, State of Michigan, County of Wayne

My commission expires Nov. 1 2018

Acting in the County of Wayne

_____
Signature of notary public

| OFFICE USE ONLY | |
|---|---|
| OFFICE CODE_____ | DATE OF FILING ____/____/____ |
| CFR I.D._____ | RECEIVED BY _____ |

Revised 02/2007

CITY CLERK 17 AUG 2017 AM 9:49

United States District Court
Eastern District of Michigan
Southern Division        Case no 17cv HON

Proof of Service

I personally served James Noseda
and Charles Raimi on this at ~~200~~ Woodward
Suite 500, Dot 48226 on Wednesday
8/30/17.

Lucinda J Cindy Darrah
8/30/17

I served James Noseda
in his office on 8/30/17, the papers
I am filing today 8/31/17.
Lucinda J Darrah
8/31/17

# THE PEOPLE VS.

**NOTICE**

## DETROIT CITY CLERK JANICE WINFREY

*August 31st*

**10:30 am Thursday**

## District Judge Mark A. Goldsmith

**Winfrey refuses to follow Det. Charter/U.S. Constitution**

**The clerk refuses to canvass the 7900 + Signatures of Detroit Voters who want ordinance 19-17 repealed Ordinance 19-17 captures increments of school taxes to finance a new Little Ceasers headquarters and for the "poor" Pistons move into Detroit.**

*guaranteed under the U.S. Constitution and the 2012 Detroit City Charter!*

*Constitution of United States of America: Amendment 1*

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances "

# Where?

*District Court*

*Federal Courthouse,*

*231 Lafayette Blvd, Detroit MI*

*Room: 860

***After Hearing go to Clerk's Office to Protest.

***2nd Floor Coleman A Young Municipal Center